UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY SMITH o/b/o
T.L.J., a minor,

         Plaintiff,                             Civil Action No. 16-CV-11520

vs.                                    HON. BERNARD A. FRIEDMAN

COMMISSIONER OF
SOCIAL SECURITY,

         Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS**

       This matter is presently before the Court on defendant's motion for summary judgment [docket entry 22]. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing.

       Plaintiff has brought this action under 42 U.S.C. § 405(g) to challenge defendant's final decision denying the applications she filed on behalf of her son, "TLJ," for Social Security child's disability and Supplemental Security Income ("SSI") benefits. An Administrative Law Judge ("ALJ") held a hearing in July 2014 (Tr. 35-69) and issued a decision denying benefits in September 2014 (Tr. 13-29). This became defendant's final decision in February 2016 when the Appeals Council denied plaintiff's request for review (Tr. 3-5).

       In a supplemental brief filed at the Court's request, defendant notes that TLJ received SSI benefits as a child based on a determination that he met the criteria of a listed impairment applicable to children (§ 111.07(A)) for cerebral palsy. When TLJ turned 18 in November 2011, defendant was required by the Social Security Act, 42 U.S.C. § 1382c(a)(3)(H)(iii), to redetermine

his eligibility for disability benefits under the standards applicable to adults.  Defendant conducted

the required redetermination in June 2012 (Tr. 71-83) and concluded that TLJ is not disabled

because he does not meet the criteria of the applicable listings (i.e., for cerebral palsy or learning

disorder) and he is able to do simple, light level work.  Defendant states that "[p]laintiff did not

request further review of this decision," Suppl. Br. at 2, and the Court sees nothing in the record to

contradict this statement.

In December 2012, plaintiff filed applications on TLJ's behalf for SSI benefits (Tr.

157-65) and child's insurance benefits (Tr. 166-72).  Both applications claim a disability onset date

of November 25, 1993, the date of TLJ's birth.[1]  It is these applications that are currently at issue,

and the legal question raised in both is the same:  whether substantial evidence supports the ALJ's

decision that TLJ is not disabled because he does not meet the criteria of the applicable listings and

because he retains the capacity to do simple, light level work.  The Court

> must affirm the Commissioner's findings if they are supported by
> substantial evidence and the Commissioner employed the proper
> legal standard. *White*, 572 F.3d at 281 (citing 42 U.S.C. § 405(g));
> *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th
> Cir. 2003); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th
> Cir. 1997). Substantial evidence is "such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, L.Ed.2d
> 842 (1971) (internal quotation marks omitted); see also *Kyle*, 609
> F.3d at 854 (quoting *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601,
> 604 (6th Cir. 2009)). Where the Commissioner's decision is
> supported by substantial evidence, it must be upheld even if the
> record might support a contrary conclusion. *Smith v. Sec'y of Health
> & Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989). However, a

---

[1] Since plaintiff did not challenge defendant's June 2012 "redetermination" decision, that
decision is binding through the decision date.  Therefore, the issue now before the Court is
whether substantial evidence supports the ALJ's decision that TLJ does not meet any of the
Listings and that he has not been disabled for any 12-month period since June 2012.

2

substantiality of evidence evaluation does not permit a selective reading of the record. "Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal citations and quotation marks omitted).

*Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 640-41 (6th Cir. 2013).

At the time of his July 2014 hearing, TLJ was 20 years old (Tr. 40). He has a high school education and no work experience (Tr. 27).[2] He claims to be disabled since birth due to cerebral palsy and "failure to thrive" (Tr. 196). At the hearing, TLJ's mother also indicated TLJ "doesn't stay on task, he doesn't complete his job" (Tr. 59). The ALJ found that plaintiff's severe impairments are "cerebral palsy; leg length discrepancy; learning disorder; attention deficit hyperactivity disorder (ADHD); and borderline intellectual functioning" (Tr. 18). The ALJ also found that TLJ does not meet the criteria of Listings § 11.07 (cerebral palsy), § 1.02 (major dysfunction of a joint), § 3.03 (asthma), or § 12.05 (intellectual disability), and that he has the residual functional capacity ("RFC") to perform a limited range of simple, light level work (Tr. 19-22).[3] Based on testimony from a vocational expert ("VE"), the ALJ concluded that TLJ is not

---

[2] When TLJ was 15 years old, he had a summer job as a "police cadet," which required him to "shadow a policeman around for the day walking the beat around the park" four days per week (Tr. 197, 202-203). This appears to be the only job he has ever held.

[3] Specifically, the ALJ found that TLJ can

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that [he] can only stand for four hours total in an eight-hour workday and walk for two hours total in an eight-hour workday; he can sit for a total of six hours in an eight-hour workday, sitting for up to one hour at a time but after sitting for 30 minutes he has the opportunity to stand or walk about for 2 minutes while still remaining

3

disabled because he could do packaging or sorting/inspecting work within these limitations (Tr. 28).

Having reviewed the administrative record, defendant's summary judgment motion, and the documents submitted by plaintiff in lieu of a summary judgment motion, the Court concludes that the ALJ's decision in this matter is not supported by substantial evidence.

First, the ALJ's decision that TLJ does not meet the criteria of Listed Impairment § 11.07 (cerebral palsy) or § 12.05 (intellectual disability) is not supported by substantial evidence.[4] At the time of the ALJ's decision, Listing § 11.07 provided as follows:

11.07 Cerebral palsy. With:

A. IQ of 70 or less; or

B. Abnormal behavior patterns, such as destructiveness or emotional instability; or

_____

on task; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; no exposure to hazards including dangerous moving machinery, operational control of moving machinery, and unprotected heights; no uneven terrain or slippery surfaces; no concentrated exposure to fumes, odors, dust, gases, poorly ventilated areas; limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements with one- to two-step simple demonstration work that allows for re-direction one time during the work day, and involving only simple work-related decisions with few, if any, workplace changes; only brief and superficial contact with the general public, supervisors, and coworkers; and work that allows him to be off task about 8% of the workday (equivalent to about 5 minutes per hour).

(Tr. 22.)

[4] Substantial evidence does support the ALJ's findings that TLJ does not meet the other two listings. Listing § 1.02A is not met because TLJ is not unable "to ambulate effectively," which the regulations defined as "an extreme limitation of the ability to walk." Listing § 3.03 is not met because plaintiff's asthma is controlled with medication.

4

C. Significant interference in communication due to speech, hearing, or visual defect; or

D. Disorganization of motor function as described in 11.04B.

And at the time of the ALJ's decision, Listing § 12.05 provided as follows:

12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

5

Substantial evidence does not support the ALJ's finding that "Listing 11.07A is not met because the claimant does not have a valid IQ score of 70 or less" (Tr. 19) or that the criteria of § 12.05C and § 12.05D are not met "because the claimant does not have a valid verbal, performance, or full scale IQ of 70 or less" (Tr. 20).[5]  Plaintiff's "full scale" IQ was indeed measured at 70 in October 2011 by a licensed psychologist, Paul Kaye, Ph.D. (Tr. 402-04).  The ALJ noted that this score "facially appears to meet the criteria of listing 11.07A," but he dismissed the score on the grounds that "there is no indication from the report or the administering psychologist that the test results were considered valid" (Tr. 19).  Instead, the ALJ adopted the full scale IQ score of 74 measured in June 2012 because the examiner, Dr. Boneff, also a licensed psychologist, said he believed "[t]he results of the IQ testing are considered valid" (Tr. 374).

The mere fact that Dr. Kaye did not state he believed the result from his testing was "valid" is not evidence that a reasonable mind would accept as an adequate basis for rejecting his test results.  Defendant's regulations on this point state:

> 6. Intelligence tests.
>
> a. The results of standardized intelligence tests may provide data that help verify the presence of intellectual disability or organic mental disorder, as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.

---

[5] Substantial evidence does support the ALJ's finding that TLJ does not meet the criteria in Listing § 11.07B, C, or D, as the record does not show he has abnormal behavior patterns, significant interference in communication, or disorganization of motor function.  Substantial evidence also supports the ALJ's finding that TLJ does not meet the criteria of Listing § 12.05A or B, as TLJ is able to take care of his personal needs and his IQ has not been measured at 59 or less.

b. Standardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A. Listing 12.05A may be the basis for adjudicating cases where the results of standardized intelligence tests are unavailable, e.g., where your condition precludes formal standardized testing.

c. Due to such factors as differing means and standard deviations, identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning. The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; e.g., the Wechsler series. IQs obtained from standardized tests that deviate from a mean of 100 and a standard deviation of 15 require conversion to a percentile rank so that we can determine the actual degree of limitation reflected by the IQ scores. In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.

d. Generally, it is preferable to use IQ measures that are wide in scope and include items that test both verbal and performance abilities. However, in special circumstances, such as the assessment of individuals with sensory, motor, or communication abnormalities, or those whose culture and background are not principally English-speaking, measures such as the Test of Nonverbal Intelligence, Third Edition (TONI–3), Leiter International Performance Scale–Revised (Leiter–R), or Peabody Picture Vocabulary Test—Third Edition (PPVT–III) may be used.

e. We may consider exceptions to formal standardized psychological testing when an individual qualified by training and experience to perform such an evaluation is not available, or in cases where appropriate standardized measures for your social, linguistic, and cultural background are not available. In these cases, the best indicator of severity is often the level of adaptive functioning and how you perform activities of daily living and social functioning.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(D). While these regulations indicate that "the narrative report that accompany test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation," they

do not provide that an IQ score can or should be ignored if the narrative report fails to make this statement. Therefore, the mere fact that Dr. Boneff stated "[t]he results of the IQ testing are considered valid" while Dr. Kaye neglected to make such a statement is not a reasonable basis for the ALJ to accept the former and reject the latter. On remand, the ALJ must give further consideration to both reports. If he again decides to reject Dr. Kaye's IQ assessment of TLJ, he must provide a reasoned basis for doing so. As the record is unclear on this point, the ALJ must send Dr. Kaye an interrogatory requesting clarification as to whether he considers his test results to be valid.

For the same reason, substantial evidence does not support the ALJ's finding that TLJ does not meet Listing § 12.05C or § 12.05D, both of which require a "valid verbal, performance, or full scale IQ of 60 through 70." The ALJ found that these listings were not met because "none of the claimant's valid verbal, performance, or full scale IQ scores are 70 or below" (Tr. 20). Plainly, this is incorrect if Dr. Kaye's evaluation is deemed to be valid, and for this reason alone remand for further proceedings is warranted. Further, the ALJ's findings regarding the restrictions of plaintiff's activities of daily living and his difficulties with concentration, persistence or pace (which the ALJ found to be "mild" and "moderate," respectively) are not supported by substantial evidence.

The regulations on these specific points state:

C. Assessment of severity. We measure severity according to the functional limitations imposed by your medically determinable mental impairment(s). We assess functional limitations using the four criteria in paragraph B of the listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis. See §§ 404.1520a and 416.920a.

8

1. Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

*   *   *

3. Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.

In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating telephone numbers, or disassembling and reassembling objects). Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability

9

to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive. We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing § 12.00.

With these standards in mind, the ALJ's conclusion that "[i]n activities of daily living, the claimant has mild restriction" is not supported by substantial evidence.  The ALJ's entire discussion of this issue consists of the following four sentences:

The claimant testified that he is able to dress and bathe himself, prepare simple meals, make his bed, do laundry, wash dishes, vacuum/seep, take out the garbage, mow the lawn, and shovel snow. His mother confirmed that he can cook using the stove.  He does not drive, but he can go out alone.  Overall the claimant's daily activities are well preserved such that there are only mild limitations in this domain.

10

(Tr. 21.)  This statement of reasons does not comport with the above-quoted regulation, which requires an assessment of the claimant's ability to engage in daily activities (including such things as "paying bills" and "maintaining a residence") without direct supervision.  The record does not support the conclusion that TLJ's ability in this regard is only mildly restricted.  Certainly, there is no evidence suggesting that TLJ does or could pay bills or maintain a residence, with or without supervision.  A Michigan state court appointed TLJ's mother to act as "partial guardian" of TLJ based on that court's determination that he lacks the capacity to care for himself in various areas, including "Financial," "Psychiatric," and "Vocational/Educational" (Tr. 181).[6]  On remand, the ALJ must consider all of the record evidence, including the state court guardianship order and Dr. DeBastos' report, in reassessing TLJ's ability to engage in activities of daily living independently.

Further, TLJ's mother testified that TLJ "doesn't stay on task," that he is "very forgetful," and needs to be reminded what to do (i.e., to finish taking out the trash or to finish washing dishes) (Tr. 59-60).  She indicated that while he can use a "George Foreman" to grill a pork chop or hamburger, a "few times" he walked away while leaving the skillet on (Tr. 60).  She made similar comments in the Function Reports, indicating that TLJ needs reminders or guidance to dress, bathe, do yard work or other chores, get his hair cut, and wash his hands (Tr. 184-85, 187, 210-11).  The ALJ's finding that TLJ's mother's opinions deserve "little weight" because "[s]he is not an

---

[6] Apparently the ALJ was unaware of this guardianship, as the court's order is dated December 1, 2015 (Tr. 181), whereas the ALJ's decision was issued shortly prior thereto, on September 22, 2014 (Tr. 13).  However, the state court decision predated the Appeals Council's decision.  Nor, apparently, was the ALJ aware of the neuropsychological assessment that was prepared Angela DeBastos, Ph.D., in January 2015 (Tr. 425-31).  She noted, among other things, that TLJ's "overall functional independence was rated as Low" (Tr. 428) and that his "significant weaknesses in executive functioning, math computation deficits, and current level of motivation . . . substantially interfere with his ability to make appropriate decisions for himself as it relates to issues of living arrangements, medical treatment, and financial management" (Tr. 429).

acceptable medical source" and "her statements are not well supported by the medical records" does not explain why her observations as to TLJ's need for close supervision should not be accepted. On remand, the ALJ must consider all of the record evidence, including TLJ's mother's statements, on this issue in  reassessing TLJ's ability to engage in activities of daily living independently.

Nor does substantial evidence support the ALJ's finding that TLJ has "moderate difficulties" with concentration, persistence or pace (Tr. 21).  The ALJ's discussion of this issue consists of the following:

> He graduated high school while receiving special education services with eligibility under the category of learning disability (see Exhibit 6F).  Despite receiving his diploma, recent testing showed that he was reading at about a fifth grade level, spelling at about a seventh grade level, and performing arithmetic at about a fourth grade level (see Exhibit 16F at page 3).  At his vocational training, he had some distractibility and difficulty with multi-step tasks and sequencing (see Exhibit 18F at page 16).  However, as discussed above, his activities of daily living are relatively intact, which suggests some capacity for preserved memory and concentration.

(Tr. 21.)  In other words, after acknowledging that TLJ graduated high school only as a "special education" student and that he tests as these very low grade levels, the ALJ found that he "has only moderate limitations in concentration, persistence, or pace" because "his activities of daily living are relatively intact" (Tyr. 21).

This finding does not, as the above-quoted regulation requires, address the question of whether TLJ has the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  Nor did the ALJ recognize this regulation's caution against "reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on . . . your ability to complete tasks in other settings that are less demanding, highly

12

structured, or more supportive."  As noted, the evidence from TLJ's mother, which the ALJ did not acknowledge or explain away, is that TLJ requires a great deal of supervision in order to do even simple things at home.  Therefore, his ability to do simple daily activities such as bathing, grilling a sandwich, or taking out trash only with reminders and supervision says little about his ability to marshal the focus and concentration required in a full-time work setting.

Moreover, the most probative evidence of TLJ's ability to concentrate and focus at work – namely, the evaluations of his performance during vocational training – directly contradicts the ALJ's finding that "[t]he records of his vocational training also weigh against a finding of disability" (Tr. 23).  The record contains three such evaluations.  The first, written by licensed social worker James Willis on behalf of Michigan Rehabilitation Services ("MRS"), reported on TLJ's work training at "bagging" and "straightening stock" at area retailers in September 2012 (Tr. 412-15).  Willis noted that TLJ

> complained excessively that the straightening job was too
> overwhelming. . . . [TLJ] needed ongoing prompts from staff to
> straighten stock in a neat and complete manner.  He also asked many
> of the same questions several times during the same shifts.  Although
> he was told several times to sweep under carts, he never did.  He also
> seemed to struggle to remember not to bag food and cleaning
> products together. . . . Staff noted that they needed to tell [him] on 4
> occasions during a 45 minute period to be sure to only place red tags
> on items in a specific section.  In addition, despite being given
> multiple prompts, he placed non sale items with sale items. . . . [H]e
> appeared distracted by merchandise and other people's conversations.
> . . . He walked away from his work area and was found 20 minutes
> later not working and sitting on a shelf. . . . He walked away from his
> work often and needed prompts to return to his assigned work area.

(Tr. 413.) Willis concluded that "[d]uring this program, [TLJ] worked independently 60-75% of the time" and that TLJ should "participate in a Work Adjustment Program to assist him to demonstrate improved core work behaviors" (Tr. 414-15).

13

The second evaluation, also written by LMSW Willis, commented on TLJ's Work Adjustment Training in November 2012 at two other area retailers. Again it was noted that TLJ "did need to be prompted on a few occasions to keep his conversations professional, . . . [TLJ] demonstrated acceptable quality and followed directions as prescribed, although he did need to be prompted to complete one aisle before moving onto the next. He also needed to have many tasks repeated for him several times before he completed the tasks as requested" (Tr. 417). The report concluded that TLJ "demonstrated acceptable focus on work 80% of the time" (Tr. 416).

The third evaluation reports on TLJ's performance during a 10-day custodial (janitorial) training program in July 2013 (Tr. 423-24). The evaluator noted:

> [TLJ] struggles with tools and equipment. The issues and challenges of distractions, following directions, working on his own, problem solving, staying on task, maintaining quality, speed, and duration, as well as inappropriate language and appearance are hindering [him] in meeting the requirements of the training. . . . [He] is easily distracted. . . . did not remember the system of sequence of cleaning, so cleaning tasks were not completed, . . . [He] forgot several important steps, . . . [T]he issues of staying on task and not being distracted continue to be an issue for [him].

(Tr. 423.)

Plainly, these evaluations contradict the ALJ's finding that TLJ's difficulties with concentration, persistence, or pace are merely "moderate" (Tr. 21). Nor may they be brushed aside with the assertion – also not supported by the record – that TLJ's "activities of daily living are relatively intact" (Tr. 21) or that the evaluators are not "acceptable medical sources" (Tr. 26). The latter assertion is particularly baffling, inasmuch as the regulations themselves recognize the importance of evaluating a claimant's focus and concentration as they relate to his ability to work

14

in an employment setting.[7]  The fact that the evaluators "only observed the claimant in work environments for short durations" is not a reasonable basis for rejecting their observations or conclusions, given that plaintiff has no other recent work to evaluate and the evaluators during the training sessions specifically looked for and commented on relevant vocational abilities.   On remand,  the ALJ must give due weight to all of the record evidence,[8] including these evaluators' reports, in reassessing the extent to which plaintiff's concentration, persistence, and pace are affected by his mental impairment.

        To summarize, the Court concludes that substantial evidence does not support the ALJ's  findings that TLJ does not meet the criteria of Listings §§ 11.07 or 12.05.  On remand, the ALJ must reevaluate whether Dr. Kaye "full scale" IQ score (70) of TLJ is valid and, if so, whether based on a review of all of the record evidence TLJ meets the criteria of §§ 11.07A, 12.05C, or 12.05D.

_____

[7] Listing § 12.00(D)(3) states:

> Work attempts. You may have attempted to work or may actually have worked during the period of time pertinent to the determination of disability. This may have been an independent attempt at work or it may have been in conjunction with a community mental health or sheltered program, and it may have been of either short or long duration. Information concerning your behavior during any attempt to work and the circumstances surrounding termination of your work effort are particularly useful in determining your ability or inability to function in a work setting. In addition, we should also examine the degree to which you require special supports (such as those provided through supported employment or transitional employment programs) in order to work.

[8] In this connection the Court notes again that the ALJ apparently was unaware of the January 2015 neuropsychological assessment of Dr. DeBastos.  She noted, among other things, "significant weaknesses in aspects of executive functioning, including sustained attention, working memory, and processing speed" (Tr. 428).

Finally, the ALJ's RFC assessment of is flawed because substantial evidence does not support the findings that TLJ would be "off task about 8% of the workday (equivalent to about 5 minutes per hour)" (Tr. 22).  While asserting this percentage figure four times in his decision (Tr. 22, first full para.; Tr. 24, first full para.; Tr. 25, second full para.; Tr. 27, second full para.), the ALJ offers no explanation as to how he arrived at it.  Nor is it supported by the record.  The only percentage estimate as to TLJ's ability to focus on his work is stated by LMSW Willis, following TLJ's second attempt at work training, who indicated that TLJ "demonstrated acceptable focus on work 80% of the time" (Tr. 416).  Willis indicated, following TLJ's first work training experience, that he "worked independently 60-75% of the time" (Tr. 414).  Further, given all of the other evidence, summarized above, of TLJ's lack of focus and concentration and his overall inability to act independently during his daily activities or his work training, no reasonable person could conclude that he would be able to maintain concentration and pace in an employment setting 92% of the time.  In any event, on remand the ALJ must provide a reasoned explanation for the 8% figure or reassess TLJ's ability in this regard, revise his RFC evaluation as appropriate, and put revised hypothetical questions to the VE.

For these reasons, the Court concludes that the ALJ's decision in this matter is not supported by substantial evidence.  Remanding the matter for an award of benefits is not called for at this time because the record, in its current state, is not such that "proof of disability is overwhelming or . . . proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).  Rather, the matter must be remanded so that the record may be further developed to address the deficiencies noted above.  Accordingly,

16

IT IS ORDERED that defendant's motion for summary judgment is denied.


IT IS FURTHER ORDERED this matter is remanded for further proceedings to address the errors identified above.  This is a sentence four remand under § 405(g).


|  | S/Bernard A. Friedman |
|---|---|
| Dated: January 20, 2017 | BERNARD A. FRIEDMAN |
| Detroit, Michigan | SENIOR UNITED STATES DISTRICT JUDGE |

17